**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| **PORTUS SINGAPORE PTE LTD & PORTUS PTY LTD,** Plaintiff, <br><br> v. <br><br> **CARRIER GLOBAL CORPORATION,** Defendant. | **Civil Action No. 4:26-cv-04444** <br><br><br> **JURY TRIAL DEMANDED** |

### PLAINTIFFS' ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

PORTUS SINGAPORE PTE LTD & PORTUS PTY LTD (collectively "Plaintiff" or "Portus") file this Original Complaint and demand for jury trial seeking relief for infringement of the claims of U.S. Patent No. 8,914,526 (the "'526 patent") and U.S. Patent No. 9,961,097 (the "'097 patent") (collectively, the "Patents-in-Suit") by Defendant Carrier Global Corporation ("Carrier" or "Defendant") during the enforceable terms of the Patents-in-Suit and within the applicable damages period.

### I. THE PARTIES

1. Plaintiff PORTUS SINGAPORE PTE LTD is a Singapore company with its principal place of business located at 6 Shenton Way, #41-01 OUE Downtown, Singapore 068809.

2. Plaintiff PORTUS PTY LTD is an Australian company with its principal place of business at C/-JGS Property Level 15, 60 Margaret Street, Sydney NSW 2000, Australia.

3. On information and belief, Defendant Carrier Global Corporation is a corporation organized and existing under the laws of the State of Delaware. Defendant Carrier Global Corporation's corporate headquarters is 13995 Pasteur Boulevard Palm Beach Gardens, FL 33418. Defendant maintains regular and established places of business in the Southern District of

Texas, including at least 290 Beltway Green Boulevard, Pasadena, Texas 77503; 10343 Sam Houston Park Drive, Houston, Texas 77064; and 100 Southbelt Industrial Drive, Houston, Texas 77047. On information and belief, these locations include Carrier field, sales, service, distribution, support, and/or commercial operations for Carrier products and services in Texas. On information and belief, Defendant sells and offers to sell products and services throughout Texas, including in this judicial district, and introduces products and services that perform infringing methods or processes into the stream of commerce knowing that they would be sold in Texas and this judicial district. Defendant can be served through its Delaware registered agent, United Agent Group Inc., 1521 Concord Pike, Suite 201, Wilmington, Delaware 19803, at any of Defendant's Texas addresses, or anywhere Defendant may be found.

4. On information and belief, Defendant directly and/or indirectly develops, designs, manufactures, distributes, markets, offers to sell, sells, operates, provides, maintains, and/or supports infringing products, applications, cloud services, account systems, smart thermostat systems, HVAC systems, Wi-Fi thermostat systems, remote monitoring systems, and related services in the United States, including in this District, and otherwise has directed infringing activities to this District in connection with its products and services.

## II. JURISDICTION AND VENUE

5. This civil action arises under the Patent Laws of the United States, 35 U.S.C. § 1 et seq., including without limitation 35 U.S.C. §§ 271, 281, 283, 284, and 285 based on Defendant's unauthorized commercial making, using, selling, offering for sale, importing, operating, providing, and supporting of the Accused Instrumentalities in the United States during the enforceable terms of the Patents-in-Suit. This Court has subject matter jurisdiction under, inter alia, 28 U.S.C. §§ 1331 and 1338(a).

6. This United States District Court for the Southern District of Texas has general and specific personal jurisdiction over Defendant because, directly and through intermediaries, Defendant has committed acts within the District giving rise to this action and is present in, transacts business in, and conducts business with residents of this District and the State of Texas.

7. Plaintiff's causes of action arise, at least in part, from Defendant's contacts with and activities in this District and the State of Texas.

8. Defendant has committed acts of infringement within this District and the State of Texas by making, using, selling, offering for sale, importing, distributing, providing, operating, and/or supporting the Accused Instrumentalities, including without limitation Carrier Infinity systems, Infinity System Controls, Carrier SmartHome applications, MyInfinity servers and web portals, Carrier Home mobile applications, Carrier account and authentication services, Carrier smart thermostats, Carrier air conditioners, heat pumps, air purifiers, zoning panels, sensors, HVAC controllers, remote-access servers and web servers, and related hardware, software, and network infrastructure configured to remotely monitor and/or control devices located in user premises networks.

9. This Court has personal jurisdiction over Defendant because Defendant has minimum contacts with this forum as a result of business regularly conducted within the State of Texas and within this District, and, on information and belief, specifically as a result of, at least, committing acts of patent infringement within Texas and this District. Defendant provides products and services accused of infringement to residents of this District that Defendant knew and intended would be used within this District, solicits business from residents of this District, and derives substantial revenue from goods and services provided to residents of this District and Texas.

10. This Court also has personal jurisdiction over Defendant because, in addition to

3

Defendant's regular and established places of business in Pasadena and Houston, Texas, Defendant has made the Accused Instrumentalities available within this judicial District and has advertised to and solicited residents within the District.

11. The amount in controversy exceeds $75,000 exclusive of interest and costs.

12. Venue is proper in this Court under 28 U.S.C. § 1400(b). Defendant is incorporated in Delaware and therefore does not reside in Texas for purposes of § 1400(b), but, on information and belief, Defendant has committed acts of infringement in this District and has regular and established places of business in this District, including at least 290 Beltway Green Boulevard, Pasadena, Texas 77503; 10343 Sam Houston Park Drive, Houston, Texas 77064; and 100 Southbelt Industrial Drive, Houston, Texas 77047. Defendant also advertises, markets, sells, offers to sell, distributes, provides, and supports the Accused Instrumentalities in this District.

## III. THE PATENTS-IN-SUIT

13. On December 16, 2014, the '526 patent, entitled "LOCAL AND REMOTE MONITORING USING A STANDARD WEB BROWSER," was duly and legally issued by the United States Patent and Trademark Office. The face of the '526 patent identifies a PCT filing date of December 17, 1999 and a patent term adjustment of 173 days. Accordingly, absent any earlier terminal disclaimer, lapse, or other enforceability limitation, the '526 patent expired no later than June 7, 2020. Plaintiff does not seek injunctive relief or damages for any alleged infringement occurring after expiration of the '526 patent. A true and correct copy of the '526 patent is attached hereto as Exhibit A.

14. On May 1, 2018, the '097 patent, entitled "SYSTEM FOR REMOTE ACCESS OF A USER PREMISES," was duly and legally issued by the United States Patent and Trademark Office. The face of the '097 patent identifies U.S. Patent Application No. 14/536,784, filed

4

November 10, 2014, as a continuation of U.S. Patent Application No. 09/868,417, filed as PCT/AU99/01128 on December 17, 1999, and further states that the '097 patent is subject to a terminal disclaimer. Plaintiff asserts the '097 patent only for alleged infringement during its enforceable term and within the applicable damages period, and does not seek injunctive relief or damages for any alleged infringement occurring after expiration of the '097 patent. A true and correct copy of the '097 patent is attached hereto as Exhibit C.

15. Portus owns the entire right, title, and interest in and to the Patents-in-Suit by assignment, including the right to bring this suit and recover damages for past infringement occurring during the enforceable terms of the Patents-in-Suit, subject to the applicable limitations period under 35 U.S.C. § 286 and any other applicable damages limitations. Defendant was not licensed to the Patents-in-Suit, either expressly or implicitly, and did not enjoy or benefit from any rights in or to the Patents-in-Suit during their enforceable terms.

16. The Patents-in-Suit are presumed valid under 35 U.S.C. § 282 and claim patent-eligible subject matter.

## IV. TECHNOLOGY OF THE PATENTS-IN-SUIT

17. The Patents-in-Suit are directed to specific technological solutions for local and remote monitoring and control of user-premises systems through standard browser-access and external network architectures. The patents explain that users of advanced automation, security, energy, and control systems commonly need both local and remote access, but conventional systems relied on cumbersome telephone-code or voice-command interfaces and did not provide a geographically independent standard interface that was universally accessible and not platform or hardware dependent. Ex. A, 1:10-56; Ex. C, 1:16-2:42.

18. The specifications identify concrete network-access problems in then-existing

systems. Remote monitoring and control systems either assumed that the site to be controlled was already actively connected to the Internet, required technically burdensome manual connection steps, or required direct telephone access that could be expensive and impractical for geographically remote users. Ex. A, 1:50-2:8; Ex. C, 2:40-64. The patents further identify surveillance, alarm-data, and premises-control problems, including that data could remain unprotected at the premises and that conventional systems did not provide practical remote interrogation and monitoring through a standard, location-independent interface. Ex. A, 2:9-31; Ex. C, 2:15-42.

19. The claimed inventions are not the abstract idea of remote monitoring, climate control, energy management, or presenting information. They recite particular arrangements of hardware processing circuitry, external first networks, user-premises networks, access browser modules, communications servers, connection gateways, authentication or authorization data, URL-based access, creation of network communications sessions, web-server/browser interactions, and serving of information from user-premises devices. See, e.g., Ex. A, claim 57; Ex. C, claim 1.

20. The specifications describe concrete architectures that improve computer-network functionality. A browser accesses an extranet located outside the home environment; a communications server in that extranet interconnects on demand with a selected connection gateway in a predetermined home environment; and the selected gateway controls and/or monitors devices in the home environment. Ex. A, Abstract; 2:34-3:4; Ex. C, Abstract; 2:44-3:8. The external network may be implemented as a virtual private network across an Internet substrate, and when a customer connects to the home, the home effectively appears as a website with devices accessible for monitoring or control. Id.

21. The claimed arrangements provide technical benefits and non-conventional features, including separating the external network and communications server from user-premises networks, using authorization or authentication data to identify the particular premises network and gateway the user may access, establishing temporary communications sessions on demand, using web-server/browser interactions to provide seamless remote access, and allowing monitoring/control of devices without requiring the user to manually establish a direct technical connection to the premises network. Ex. A, claim 57; Ex. C, claim 1.

22. The patents further disclose concrete structures and operations, including a provider extranet, distributed storage, distributed databases, communications servers, service nodes, Internet access devices, telecommunications networks, premises gateways, premises network terminals, appliances, sensors, control terminals, user-premises network protocol stacks, HTTP server functionality, TCP/IP protocol stacks, device drivers, and physical interfaces. Ex. A, Figs. 1-6; Ex. C, Figs. 1-6.

23. The Patents-in-Suit therefore claim specific improvements to computer-network access and remote user-premises monitoring/control technology, not merely an instruction to apply a generic business practice on a computer. The claims are directed to particular network architectures and ordered combinations that solve problems rooted in computer networking, remote access, authentication, and gateway-mediated user-premises device control.

## V. ACCUSED INSTRUMENTALITIES

24. The terms "Accused Instrumentalities" and "Accused Products" refer to, by way of example and without limitation, Defendant's Carrier Infinity systems, Infinity System Controls, Carrier SmartHome mobile applications, Carrier Home mobile applications, MyInfinity web servers and web portals, MyInfinity services network, Carrier account and authorization systems,

7

authentication systems, remote-access servers and web servers, Carrier smart thermostats, Infinity thermostats, ecobee for Carrier smart thermostats, Carrier air conditioners, heat pumps, air purifiers, zoning panels, sensors, HVAC controllers, related user devices configured to operate with Carrier remote monitoring systems, and all other substantially similar systems, components, applications, services, and instrumentalities used to remotely monitor and/or control devices located in user premises networks during the enforceable terms of the Patents-in-Suit. Plaintiff's infringement allegations are directed to accused making, using, selling, offering for sale, importing, operating, providing, and/or supporting of those Accused Instrumentalities during the enforceable terms of the Patents-in-Suit and within the applicable damages period.

25. The Accused Instrumentalities include at least one accused instrumentality group: Carrier Infinity and SmartHome systems, including Carrier Infinity System Controls, Carrier smart thermostats, Carrier SmartHome mobile applications, Carrier Home mobile applications, MyInfinity web servers and services, Carrier air conditioners, heat pumps, air purifiers, zoning panels, sensors, HVAC controllers, and related Carrier cloud, account, authentication, and remote-access services. Exhibit B supports Plaintiff's allegations that the Accused Instrumentalities infringe at least claim 57 of the '526 patent. Exhibit D supports Plaintiff's allegations that the Accused Instrumentalities infringe at least claim 1 of the '097 patent.

**A. Carrier Infinity, SmartHome, and MyInfinity Systems - '526 Patent**

26. Carrier provides and supports Carrier Infinity, SmartHome, and MyInfinity systems deployed at user premises and connected to the Carrier SmartHome application, Carrier Home mobile application, MyInfinity web portal, and related Carrier cloud services for remote monitoring and/or control. Exhibit B identifies the accused system as including the Carrier Infinity System, smart thermostats, air conditioners, heat pumps, air purifiers, and related Carrier

8

SmartHome App services deployed within homes or user premises for remote monitoring/control of user-premises devices. Ex. B at 1-2.

27. For purposes of Plaintiff's infringement allegations under the '526 patent, Exhibit B identifies the first network as the MyInfinity services network; the first arrangement of processing circuitry as MyInfinity server/backend processing circuitry programmed to manage accounts, device registration, device-state synchronization, and remote access; the user access browser device as smartphones, tablets, PCs, thermostats, or other user devices running the Carrier SmartHome app, Carrier Home app, a web browser, or access-browser functionality; and the second arrangements of processing circuitry as Carrier smart thermostats, Infinity System Controls, HVAC equipment, air purifiers, zones, sensors, and related hardware deployed in user premises networks. Ex. B at 3-8.

28. The Carrier Infinity, SmartHome, and MyInfinity systems practice the preamble and limitations [57A] and [57B] of claim 57 because they provide a system for remote access of user premises networks located in respective user premises; include a first external network with programmed processing circuitry that controls network access; include a hardware user access browser device; and include plural second arrangements of processing circuitry located in respective user premises networks. Exhibit B identifies Carrier smart thermostats and controls deployed in homes, each with embedded processors and network interfaces, connected to home Wi-Fi or other user-premises networks, and coordinated with MyInfinity server or SmartHome app services for remote access. Ex. B at 1-8.

29. The Carrier Infinity, SmartHome, and MyInfinity systems practice limitation [57C] because the MyInfinity server and SmartHome app backend are adapted by programming to initiate or cause the establishment of network connections with selected Carrier smart

9

thermostats, Infinity System Controls, HVAC controllers, air conditioners, heat pumps, air purifiers, zoning systems, and associated premises devices when an authorized user logs in, registers a device, selects a thermostat or zone, or requests remote monitoring/control through the Carrier SmartHome app, Carrier Home app, or MyInfinity portal. Exhibit B identifies that, upon authenticated remote access, MyInfinity server establishes network communications with registered thermostats over the Internet/home-Wi-Fi path to exchange control commands and status or usage information. Ex. B at 9-10.

30. The Carrier Infinity, SmartHome, and MyInfinity systems practice limitation [57D] because the Carrier SmartHome app, Carrier Home mobile app, MyInfinity web portal, thermostat interface, and corresponding network-access functionality operate as access-browser functionality for locating and examining information on the MyInfinity first network and on user premises networks through URL/URI-addressed resources, HTTP/HTTPS endpoints, and user selections that cause the client to access predetermined network locations. Ex. B at 11. To the extent Defendant contends that a native mobile application or thermostat interface is not literally a browser, the Carrier SmartHome app, Carrier Home mobile app, and thermostat interface are at least equivalent because they perform substantially the same access-browser function, in substantially the same URL/URI-addressed HTTP/HTTPS or network-resource way, to achieve substantially the same result of locating and examining external-network and user-premises information.

31. The Carrier Infinity, SmartHome, and MyInfinity systems practice limitations [57E] and [57F] because each registered Carrier thermostat, Infinity System Control, HVAC controller, air conditioner, heat pump, air purifier, or related premises device is accessible by the MyInfinity first circuitry arrangement, and the accused systems rely on authorization data, including Carrier

10

account, password, device-registration, thermostat-registration, MAC address, serial-number, QR-code, and device-association data, to determine which registered thermostat, premises network, HVAC component, zone, or device state the user is authorized to monitor and/or control. Ex. B at 12-16.

32. The Carrier Infinity, SmartHome, and MyInfinity systems practice limitation [57G] because, after authorized access, Carrier cloud services establish network communications with the selected registered thermostat, Infinity System Control, or premises network to access device state, HVAC status, temperature, humidity, mode, setpoint, schedule, zone, air-quality, energy usage, alert, and/or settings data, and/or to deliver commands or updates. These communications create network sessions, including HTTPS/TLS request/response sessions and/or cloud synchronization sessions, that temporarily interconnect the MyInfinity services network with the determined user premises network for monitoring and/or control. Ex. B at 16-18.

33. The Carrier Infinity, SmartHome, and MyInfinity systems practice limitations [57H] and [57I] because the MyInfinity services network obtains information contained within the user premises network from the selected thermostat, Infinity System Control, or associated second circuitry arrangement and, using a Carrier server or web server, serves that information to the user's access-browser device, including current temperature, setpoint, humidity, mode, schedule, zone status, HVAC status, energy or usage information, alerts, air-quality status, and settings information. Ex. B at 18-22.

34. The Carrier Infinity, SmartHome, and MyInfinity systems practice limitations [57J] and [57K] because the communications session provides the user with seamless remote access to information stored on or obtained from the determined premises network, and monitoring/control is performed through interaction with information served by the selected thermostat, Infinity

11

System Control, HVAC controller, or associated second circuitry arrangement. Exhibit B identifies Carrier's SmartHome app, web portal, and MyInfinity registration/remote-access flow, through which users remotely access and adjust settings of the Infinity System Control and associated HVAC equipment. Ex. B at 3-23.

**B. Carrier Infinity, SmartHome, and MyInfinity Systems - '097 Patent**

35. Carrier also infringed at least claim 1 of the '097 patent through the same Carrier Infinity, SmartHome, and MyInfinity systems, Carrier smart thermostats, Infinity System Controls, HVAC equipment, SmartHome app, MyInfinity services network, and related cloud services. Exhibit D identifies the accused system as including the Carrier Infinity System, smart thermostat, air conditioners, heat pumps, air purifiers, and Carrier SmartHome App services deployed within a home or user premises and connected to Carrier services for remote monitoring/control. Ex. D at 1-4.

36. For purposes of Plaintiff's infringement allegations under the '097 patent, Exhibit D identifies the first hardware processing circuitry as a user's phone, tablet, PC, thermostat control panel, or other device running the SmartHome app, MyInfinity web portal, or access browser module; the second hardware processing circuitry as the MyInfinity server located in the MyInfinity services network; and the connection gateway as the Carrier smart thermostat, Infinity System Control, or related communication components located in and part of the local network of the user premises. Ex. D at 3-8.

37. The Carrier Infinity, SmartHome, and MyInfinity systems practice the preamble and limitations [1A] and [1B] of claim 1 because they provide a system for remote access of a user premises; include first hardware processing circuitry running an access browser module; include second hardware processing circuitry located in a first network; and include a connection

gateway located in, and part of, a local network of the user premises. Exhibit D identifies the MyInfinity server network, user phone/SmartHome app or web-portal access module, and the smart thermostat or Infinity System Control as a connection gateway between the MyInfinity server and AC, heat pump, purifier, zoning, sensor, or HVAC components in the premises network. Ex. D at 1-8.

38. The Carrier Infinity, SmartHome, and MyInfinity systems practice limitations [1C] and [1D] because the MyInfinity server is external to the user premises, accessible via the SmartHome app/access browser module, MyInfinity web portal, or thermostat control panel, and configured to communicate on demand with the connection gateway. The connection gateway is integrated with or communicatively coupled to networked components of the local user-premises network, including air conditioners, heat pumps, fan coils, air purifiers, zoning panels, sensors, and other HVAC components. Ex. D at 8-11.

39. The Carrier Infinity, SmartHome, and MyInfinity systems practice limitation [1E] because the system is configured such that user input through URL/URI-addressed app or browser resources, SmartHome app screens, MyInfinity web portal screens, thermostat controls, or other access-browser commands causes the first hardware processing circuitry, using the access browser module, to access an address on the MyInfinity first network. The MyInfinity server then serves information regarding at least one networked component of the local network, including thermostat state, HVAC state, temperature, humidity, mode, setpoint, schedule, zone, usage, air quality, alert, and settings information, and obtains that information from the thermostat or Infinity System Control gateway without a direct communicative coupling between the MyInfinity server and every networked component of the local network. Ex. D at 12-13.

40. The Carrier Infinity, SmartHome, and MyInfinity systems practice limitation [1F]

13

because the sequence includes the first hardware processing circuitry transmitting authentication data, including Carrier account credentials, password, device-registration data, thermostat-registration data, MAC address, serial number, QR-code data, authorization tokens, and/or device-association data, to the MyInfinity second hardware processing circuitry. Transmission of that authentication data is required before the MyInfinity server serves thermostat or HVAC information to the user device. Exhibit D identifies that once a thermostat is registered to a user account, the MyInfinity server can remotely access that thermostat for monitoring and control functions through the SmartHome app or web portal. Ex. D at 14-16.

41. The Carrier Infinity, SmartHome, and MyInfinity systems practice limitations [1G], [1H], and [1I] because the system supports a plurality of user premises, each with its own Carrier smart thermostat, Infinity System Control, or connection gateway; the MyInfinity second hardware processing circuitry is configured to connect to such gateways; the MyInfinity server determines which local network or registered device the authentication data indicates authority to access; and, upon verification of the authentication data, the MyInfinity server establishes a new communication session between the user device and the gateway of the respective local network. Ex. D at 17-19.

42. The Carrier Infinity, SmartHome, and MyInfinity systems practice limitations [1J] and [1K] because the MyInfinity second hardware processing circuitry receives, via the thermostat/Infinity System Control connection gateway, selected information from at least one networked component of the local network of the user premises; stores selected information in the first network for subsequent review by an authorized user; and allows the same authentication authority used to access the thermostat or local-network component to access and review previously stored selected information, including monitored HVAC usage, history, alerts,

schedules, energy information, or other stored thermostat/HVAC data, via the SmartHome app, web portal, or access browser module. Ex. D at 20-21.

## VI. DEFENDANT'S USE AND CONTROL OF THE ACCUSED SYSTEMS

43. Defendant has directly used the Accused Instrumentalities under 35 U.S.C. § 271(a) by putting the claimed systems into service and obtaining benefit from them. Defendant designs, provides, licenses, authorizes, brands, markets, sells, offers to sell, operates, maintains, and/or controls the Carrier Infinity products, SmartHome applications, Carrier Home applications, MyInfinity server services, account-registration systems, authentication systems, remote-access features, and related infrastructure that cause the claimed network operations to occur. Defendant benefits from each accused use through sales of Carrier products, adoption of the Carrier remote monitoring ecosystem, customer retention, service relationships, cloud/app usage, and other commercial benefits.

44. To the extent Defendant asserts that end users, smartphones, tablets, PCs, routers, thermostats, HVAC components, MyInfinity servers, SmartHome applications, Carrier dealers, affiliates, contractors, or other components are owned or operated by different actors, Defendant still directly infringes the asserted system claims because Defendant makes, sells, offers, provides, and puts into service the claimed system as a whole and exercises beneficial use and control over the accused system. Defendant controls and benefits from the accused system architecture by specifying the Carrier-branded products, authorizing and controlling the SmartHome app and MyInfinity server architecture, requiring account/device registration and authentication, defining supported devices, providing instructions for setup and use, and causing remote-access sessions to be established between user devices, MyInfinity servers, and in-premises thermostat/HVAC gateways.

15

45. Defendant also directs or controls the performance of any end-user steps that Defendant may contend are required to complete the accused operation. Defendant conditions participation in and use of the accused remote-access service on users purchasing or using Carrier products, downloading or using the Carrier SmartHome app or Carrier Home app, creating or using a Carrier/MyInfinity account, registering thermostats or HVAC devices, entering authentication data, connecting the thermostat or Infinity System Control to a local Wi-Fi network, and following prescribed setup and connection procedures. Defendant establishes the manner and timing of that performance through product design, app workflows, on-screen prompts, account-registration requirements, authentication protocols, user manuals, cloud/server rules, and technical restrictions that prevent remote access unless the user follows Defendant's specified steps.

46. The accused remote-access functionality also benefits Defendant. Defendant benefits from sales of Carrier Infinity and smart-thermostat products, use of the Carrier SmartHome app and MyInfinity services, customer adoption of the remote-access ecosystem, product support relationships, dealer and service opportunities, brand value, service usage, device registrations, and users' reliance on the accused cloud/app services for remote thermostat control, HVAC monitoring, energy management, alerts, storage, and control. Defendant therefore both conditions use of the accused systems on performance of the claimed operations and establishes the manner or timing of that performance, while receiving commercial and technical benefit from the completed accused system.

## VII. COUNT I - INFRINGEMENT OF THE '526 PATENT

47. Plaintiff restates and realleges the preceding paragraphs of this Complaint as if fully set forth herein.

48. Defendant has directly infringed, literally and/or under the doctrine of equivalents, one or more claims of the '526 patent, including without limitation at least claim 57, under 35 U.S.C. § 271(a), by making, using, testing, selling, offering for sale, importing, operating, providing, and/or supporting the Accused Instrumentalities in the United States during the enforceable term of the '526 patent and within the applicable damages period.

49. Defendant's Accused Instrumentalities practice at least claim 57 of the '526 patent for the reasons alleged above and as further supported by the preliminary exemplary infringement chart attached as Exhibit B. Exhibit B is incorporated by reference. These allegations are preliminary and based on publicly available information; Plaintiff reserves the right to supplement, modify, and amend these allegations based on discovery.

50. Defendant's infringement has caused Plaintiff damage. Plaintiff is entitled to recover damages adequate to compensate for Defendant's infringement of the '526 patent during the enforceable term of the '526 patent and within the applicable damages period, in no event less than a reasonable royalty, together with interest and costs as fixed by the Court under 35 U.S.C. § 284. Plaintiff does not seek injunctive relief or damages for alleged infringement occurring after expiration of the '526 patent.

51. Defendant has indirectly infringed, and/or contributed to infringement of, one or more claims of the '526 patent to the extent discovery shows that Defendant knew of the '526 patent during its enforceable term and induced or contributed to use of the Accused Instrumentalities by instructing, encouraging, and enabling customers and users to register Carrier devices, authenticate, connect Carrier thermostats and HVAC components, and use the Carrier SmartHome app, Carrier Home app, MyInfinity web portal, and Carrier cloud services to remotely monitor or control user-premises devices.

17

## VIII. COUNT II - INFRINGEMENT OF THE '097 PATENT

52. Plaintiff restates and realleges the preceding paragraphs of this Complaint as if fully set forth herein.

53. Defendant has directly infringed, literally and/or under the doctrine of equivalents, one or more claims of the '097 patent, including without limitation at least claim 1, under 35 U.S.C. § 271(a), by making, using, testing, selling, offering for sale, importing, operating, providing, and/or supporting the Accused Instrumentalities in the United States during the enforceable term of the '097 patent and within the applicable damages period.

54. Defendant's Accused Instrumentalities practice at least claim 1 of the '097 patent for the reasons alleged above and as further supported by the preliminary exemplary infringement chart attached as Exhibit D. Exhibit D is incorporated by reference. These allegations are preliminary and based on publicly available information; Plaintiff reserves the right to supplement, modify, and amend these allegations based on discovery.

55. Defendant's infringement has caused Plaintiff damage. Plaintiff is entitled to recover damages adequate to compensate for Defendant's infringement of the '097 patent during the enforceable term of the '097 patent and within the applicable damages period, in no event less than a reasonable royalty, together with interest and costs as fixed by the Court under 35 U.S.C. § 284. Plaintiff does not seek injunctive relief or damages for alleged infringement occurring after expiration of the '097 patent.

56. Defendant has indirectly infringed, and/or contributed to infringement of, one or more claims of the '097 patent to the extent discovery shows that Defendant knew of the '097 patent during its enforceable term and induced or contributed to use of the Accused Instrumentalities by instructing, encouraging, and enabling customers and users to register Carrier devices,

authenticate, connect Carrier thermostats and HVAC components, and use the Carrier SmartHome app, Carrier Home app, MyInfinity web portal, and Carrier cloud services to remotely monitor or control user-premises devices and review stored information.

## IX. CONDITIONS PRECEDENT

57. Plaintiff has never sold a product. Upon information and belief, no Plaintiff predecessor-in-interest has ever sold a product. Neither Plaintiff nor any licensee made or sold a patented article. Plaintiff is a non-practicing entity, with no products to mark. Plaintiff has pled all statutory requirements to obtain pre-suit damages. Further, all conditions precedent to recovery are met. Under the rule of reason analysis, Plaintiff has taken reasonable steps to ensure marking by any licensee producing a patented article.

58. Plaintiff and its predecessors-in-interest have entered into settlement licenses with several defendant entities, but none of the settlement licenses were to produce a patented article, for or under Plaintiff's patents. Duties of confidentiality prevent disclosure of settlement licenses and their terms in this pleading, but discovery will show that Plaintiff and its predecessors-in-interest have substantially complied with 35 U.S.C. § 287(a). Furthermore, each of the defendant entities in the settlement licenses did not agree that it was infringing any of Plaintiff's patents, including the Patents-in-Suit, and thus was not entering into the settlement license to produce a patented article for Plaintiff or under its patents. Further, to the extent necessary, Plaintiff will limit its claims of infringement to method or system-use damages for which no marking requirement applies, and/or will show that any marking obligation was satisfied or inapplicable.

59. To the extent Defendant identifies an alleged unmarked product produced for Plaintiff or under Plaintiff's patents, Plaintiff will develop evidence in discovery to show that the alleged unmarked product does not practice the Patents-in-Suit and/or that Plaintiff has substantially

complied with the marking statute. Defendant has not identified any alleged patented article for which § 287(a) would apply. Further, Defendant has not alleged any defendant entity produced a patented article under authority from Plaintiff.

60. The policy of § 287 serves three related purposes: (1) helping to avoid innocent infringement; (2) encouraging patentees to give public notice that an article is patented; and (3) aiding the public to identify whether an article is patented. These policy considerations are advanced when parties are allowed to freely settle cases without admitting infringement and thus do not require marking. All settlement licenses were to end litigation and thus the policies of § 287 are not violated. Such a result is further warranted by 35 U.S.C. § 286, which allows for recovery of damages for six years prior to the filing of the complaint, subject to the expiration and other limitations stated herein.

61. For each previous settlement license, Plaintiff understood that (1) the settlement license was the end of litigation between the defendant entity and Plaintiff and was not a license where the defendant entity was looking to sell a product under any of Plaintiff's patents; (2) the settlement license was entered into to terminate litigation and prevent future litigation between Plaintiff and the defendant entity for patent infringement; (3) the defendant entity did not believe it produced any product that could be considered a patented article under 35 U.S.C. § 287; and (4) Plaintiff believes it has taken reasonable steps to ensure compliance with 35 U.S.C. § 287 for each prior settlement license.

62. Each settlement license that was entered into between a defendant entity and Plaintiff was negotiated in the face of continued litigation and, while Plaintiff believed there was infringement, no defendant entity agreed that it was infringing. Thus, each prior settlement license reflected a desire to end litigation and as such the policies of § 287 are not violated.

20

63. For any prior settlement, the settling defendant was not licensed to make and sell infringing products in the future, thus the marking statute imposes no obligation on Plaintiff to make an effort to require a prior settling defendant to mark products Plaintiff had accused of infringement. To the extent necessary, Plaintiff will develop evidence in discovery showing that no prior settlement license required or authorized future manufacture or sale of a patented article under the Patents-in-Suit.

## X. JURY DEMAND

64. Plaintiff demands a trial by jury on all issues so triable.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendant as follows:

a. That Defendant infringed one or more claims of the Patents-in-Suit during the enforceable terms of the Patents-in-Suit and within the applicable damages period;

b. That Plaintiff be awarded damages adequate to compensate Plaintiff for Defendant's infringement during the enforceable terms of the Patents-in-Suit and within the applicable damages period, but in no event less than a reasonable royalty, together with prejudgment and post-judgment interest and costs under 35 U.S.C. § 284;

c. That this case be found exceptional under 35 U.S.C. § 285 and that Plaintiff be awarded its reasonable attorneys' fees and costs to the extent permitted by law;

d. That Plaintiff be awarded all other relief to which it is entitled at law or in equity, except that Plaintiff does not seek injunctive relief or damages for any alleged post-expiration infringement of the Patents-in-Suit.

Dated:  June 4, 2026

Respectfully submitted,

*/s/ William P. Ramey, III*

William P. Ramey, III
Texas Bar No. 24027643
**Ramey LLP**
446 Heights Blvd., Suite 200
Houston, Texas 77007
(713) 426-3923
wramey@rameyfirm.com

***Attorneys for Portus Singapore PTE Ltd., & Portus PTY Ltd.***

22